## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                   )

|  |  |
|---|---|
| NEW YORK REPUBLICAN STATE COMMITTEE<br>315 State Street<br>Albany, NY 12210 | ) ) ) ) ) |
| TENNESSEE REPUBLICAN PARTY<br>2424 21st Avenue, Suite 200<br>Nashville, TN 37212 | ) ) ) ) |
| _Plaintiffs_,<br>v. | ) )   Case No. |
| UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549, | ) ) ) ) ) |
| _Defendant_. | ) ) |

_____)

## COMPLAINT

Plaintiffs, the New York Republican State Committee and the Tennessee Republican Party, by and through their undersigned attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.     This is a civil action challenging a regulation promulgated by the United States Securities and Exchange Commission ("SEC") as violating the Administrative Procedure Act ("APA") and the First Amendment to the United States Constitution.

2.     Through this action, Plaintiffs challenge the lawfulness of the SEC's "Political Contribution Rule," 17 C.F.R. §§ 275.204-2; 275.206(4)-3; and 275.206(4)–5, (together, the "Political Contribution Rule"), which the SEC promulgated in excess of its statutory jurisdiction

and authority, arbitrarily and capriciously, and in violation of the First Amendment.  The Political Contribution Rule also conflicts with Congress' express directive that federal campaign finance be exclusively governed through the Federal Election Campaign Act of 1971 ("FECA"), over which Congress gave the Federal Election Commission ("FEC") exclusive jurisdiction.

3.      The Political Contribution Rule prohibits certain investment advisers and certain of their officers and employees from making contributions to political party committees, such as Plaintiffs.  Additionally, it limits the ability of certain investment advisers and certain of their officers and employees to make financial contributions—that are otherwise permitted under federal law—to certain candidates for political office if those advisers may, within the following two years, compete for business from a state agency over which the candidate may hold influence.

4.      By doing so, the Political Contribution Rule creates two separate political contribution limits for candidates for the same office.

5.      The SEC lacks statutory authority to regulate campaign contributions.  Indeed, Congress has given the FEC exclusive jurisdiction over campaign contributions to candidates for federal elected office.

6.      The Political Contribution Rule impairs Plaintiffs' ability to raise funds.  Likewise, the Political Contribution Rule impairs Plaintiffs' members' ability to make political contributions.

7.      The Political Contribution Rule also discourages competition by, *inter alia*, favoring incumbents over challenges by state and local officials.

8.      Plaintiffs bring this action to obtain a declaration that the SEC's conduct is unlawful and unauthorized and to enjoin enforcement of the Political Contribution Rule.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201 as a challenge arising under the First Amendment to the Constitution of the United States, the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

10.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b) and (e) because the Defendant is a United States agency headquartered in the District of Columbia, and because a substantial part of the events giving rise to this claim occurred in the District of Columbia.

**PARTIES**

11.     Plaintiff New York Republican State Committee is the state party organization of the Republican Party for the State of New York.  It is composed of members from within the State of New York, many of whom are precluded from providing it with financial support due to the Political Contribution Rule.  It also represents individuals who are, have been, or are considering becoming candidates for elected office and who are harmed by the Political Contribution Rule, which subjects them to different political contribution limits than those imposed on other candidates.  Plaintiff New York Republican State Committee has its headquarters at 315 State Street, Albany, NY 12210.

12.     Plaintiff Tennessee Republican Party is the state party organization of the Republican Party for the State of Tennessee.  It is composed of members from within the State of Tennessee, many of whom are precluded from providing it with financial support due to the Political Contribution Rule.  It also represents individuals who are, have been, or are considering

becoming candidates for elected office and who are harmed by the Political Contribution Rule, which subjects them to different political contribution limits than those imposed on other candidates.  Plaintiff Tennessee Republican Party has its headquarters at 2424 21st Avenue, Suite 200, Nashville, TN 37212.

13.     Defendant United States Securities and Exchange Commission is a federal agency created pursuant to the Securities Exchange Act of 1934, 15 U.S.C §§ 78a, 78d.  Defendant's headquarters are located at 100 F Street, N.E., Washington, D.C. 20549.

## FACTS

## I.     The SEC Promulgates a Rule Regulating Political Contributions.

14.     The Investment Advisers Act of 1940 (the "Advisers Act"), codified at 15 U.S.C. § 80b-1 *et seq*., provides that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly – … (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6.  And "[t]he Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."  *Id.* § 80b-6(4)

15.     In 1999, the SEC "[p]ublish[ed] for comment a new rule under the Investment Advisers Act of 1940 that would prohibit an investment adviser from providing advisory services for compensation to a government client for two years after the adviser or any of its partners, executive officers or solicitors make a contribution to certain elected officials or candidates." *Political Contributions by Certain Investment Advisers*, 64 Fed. Reg. 43,556 (proposed Aug. 10, 1999) (the "1999 Proposal").

16.     The 1999 Proposal elicited a letter from three FEC commissioners stating that it

"encroach[es] upon the exclusive domain of the FECA."   Letter from Darryl R. Wold, Vice Chairman, et al., to Jonathan G. Katz, Secretary, Securities and Exchange Commission (Nov. 1, 1999).  The commissioners further stated that the 1999 Proposal conflicted with Congress' intent to vest in the FEC "sole jurisdiction to enforce the provisions contained within the FECA's covered areas."

17.     The SEC did not issue a final rule based on the 1999 Proposal.

18.     On August 7, 2009, the SEC proposed for comment a new rule regulating political contributions of investment advisers. *See Political Contributions by Certain Investment Advisers*, 74 Fed. Reg. 39,840 (proposed Aug. 7, 2009).  This proposed rule largely mirrored the provisions of the 1999 Proposal.

19.     On or about July 1, 2010, the SEC approved a final rule "[u]nder the Investment Advisers Act of 1940 that prohibits an investment adviser from providing advisory services for compensation to a government client for two years after the adviser or certain of its executives or employees make a contribution to certain elected officials or candidates." *Political Contributions by Certain Investment Advisers*; 75 Fed. Reg. 41,018, 41,018 (July 14, 2010).  This new rule—the Political Contribution Rule—was codified at 17 C.F.R. §§ 275.204-2, 275.206(4)-3, and 275.206(4)-5 and was published in the Federal Register on July 14, 2010.  Several of the Political Contribution Rule's provisions became effective on March 14, 2011, with the remaining provisions becoming effective on September 13, 2011.

20.     The Political Contribution Rule purports to prevent, limit, and restrict so-called "pay to play" practices involving the management of public pension plans, in which investment advisers allegedly "[s]eek to influence government officials' awards of advisory contracts," and elected officials allegedly "[a]llow political contributions to play a role in the management of

[public pension plan] assets and … use these assets to reward contributors."  75 Fed. Reg. at 41,019.  But the SEC acknowledged that the existence of pay to play practices "is often hard to prove."  *Id.*

21.     The SEC stated that 15 U.S.C. § 80b–6(4) gave it the statutory authority to issue the Political Contribution Rule:  "[W]e believe rule 206(4)-5 is a proper exercise of our rulemaking authority under the Advisers Act to prevent fraudulent and manipulative conduct."  *Id.* at 41,021

22.     While the Political Contribution Rule does not directly prevent fraudulent or manipulative conduct, the SEC claimed it prevents conduct that "undermine[s] the fairness of the process by which public contracts are awarded" and that protecting the "fairness" of public contracting is within its broad rulemaking authority "[t]o adopt rules 'reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive or manipulative."  75 Fed. Reg. at 41,019, 41,022.  The SEC also asserted that Section 206(4) "[p]ermits the Commission to adopt prophylactic rules that may prohibit acts that are not themselves fraudulent."  *Id.* at 41,022.

## II.     The Political Contribution Rule Restricts Political Contributions.

23.     The Political Contribution Rule restricts political contributions in several ways.  It effectively prohibits an investment adviser and certain of its employees from making contributions to certain candidates for elected office.  It also operates to restrict the same individuals and entities from soliciting or coordinating political contributions to certain candidates.  The Political Contribution Rule's prohibitions are triggered even where the investment adviser operates in a larger investment pool, which competes broadly for advisory business from various states.  And the Political Contribution Rule includes a broad "catch-all" provision that covers nearly all political activities of investment advisers and includes extensive record keeping requirements that serve to dissuade investment advisers from making even *de minimis* contributions.

*a.  The Political Contribution Rule restricts individual political contributions.*

24.    The Political Contribution Rule effectively restricts individual political contributions by making it "unlawful for an adviser to receive compensation for providing advisory services to a government entity for a two-year period after the adviser or any of its covered associates makes a political contribution to a public official of a government entity or candidate for such office who is or will be in a position to influence the award of advisory business."  75 Fed. Reg. at 41,024.

25.    The two-year ban broadly applies to "any investment adviser registered (or required to be registered) with the Commission, or unregistered in reliance on the exemption available under section 203(b)(3) of the Advisers Act."  17 C.F.R. § 275.206(4)-5(a)(1).

26.    The two-year ban also applies to "covered associates" of an investment adviser, which include: "(i) Any general partner, managing member or executive officer, or other individual with a similar status or function; (ii) any employee who solicits a government entity for the investment adviser and any person who supervises, directly or indirectly, such employee; and (iii) any political action committee controlled by the investment adviser or by any of its covered associates."  75 Fed. Reg. at 41,031; *see also* 17 C.F.R. § 275.206(4)-5(f)(2).

27.    The ban applies when a political contribution has been made to a "public official of a government entity," which "includes an incumbent, candidate or successful candidate for elective office of a government entity if the office is directly or indirectly responsible for, or can influence the outcome of, the hiring of an investment adviser or has authority to appoint any person who is directly or indirectly responsible for, or can influence the outcome of, the hiring of an investment adviser.  Government entities include all State and local governments, their agencies and instrumentalities, and all public pension plans and other collective government funds, including participant-directed plans such as 403(b), 457, and 529 plans."  75 Fed. Reg. at 41,024, 41,029;

*see also* 17 C.F.R. § 275.206(4)-5(f)(5)–(6).

28.     The Political Contribution Rule's prohibitions are triggered "by contributions, not only to elected officials who have legal authority to hire the adviser, but also to elected officials (such as persons with appointment authority) who can influence the hiring of the adviser." 75 Fed. Reg. at 41,029.

29.     In defining the covered contributions, the Political Contribution Rule borrows almost *verbatim* from FECA's definition of "contribution": "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A); *cf.* 17 C.F.R. § 275.206(4)-5(f)(1).

30.     Additionally, under the Political Contribution Rule a political action committee that is "controlled" by an investment adviser is completely banned from making a contribution to a covered public official of a government entity who is also a candidate for elected office. 17 C.F.R. § 275.206(4)-5(f)(2)(iii).

31.     There are very limited exceptions to the Political Contribution Rule's two-year ban:

- "*De minimis* contributions": "Rule 206(4)-5 permits individuals to make aggregate contributions without triggering the two-year time out of up to $350, per election, to an elected official or candidate for whom the individual is entitled to vote, and up to $150, per election, to an elected official or candidate for whom the individual is not entitled to vote." 75 Fed. Reg. at 41,034 (footnotes omitted); *see also* 17 C.F.R. § 275.206(4)-5(b)(1). This exception is limited to "natural person[s]," and is thus unavailable to any political action committee controlled by an investment adviser. 17 C.F.R. §§ 275.206(4)-5(b)(1), 275.206(4)-5(f)(2)(iii).

- New covered associates:  The Political Contribution Rule "shall not apply to an investment adviser as a result of a contribution made by a natural person more than six months prior to becoming a covered associate of the investment adviser unless such person, after becoming a covered associate, solicits clients on behalf of the investment adviser." 17 C.F.R. § 275.206(4)-5(b)(2).

- The SEC may also "exempt" an investment adviser who has made a political contribution in violation of the SEC's rule from the two-year ban.  *See* 17 C.F.R. § 275.206(4)-5(e).

32.     The Political Contribution Rule purportedly "does not ban political contributions and does not limit the amount of any political contribution.  Instead, the rule imposes a ban – a 'time out' – on receiving compensation for conducting advisory business with a government client for two years after certain contributions are made."  75 Fed. Reg. at 41,026.  But the SEC acknowledged "that the two-year time out provision may affect the propensity of investment advisers to make political contributions."  *Id.* at 41,023.

> **b.  *The Political Contribution Rule restricts investment advisers from soliciting or coordinating political contributions to state political parties.***

33.     The Political Contribution Rule also "prohibits advisers and covered persons from coordinating or soliciting any person or PAC to make (i) any contribution to an official of a government entity to which the adviser is providing or seeking to provide investment advisory services, or (ii) any payment to a political party of a State or locality where the investment adviser is providing or seeking to provide investment advisory services to a government entity."  75 Fed. Reg. at 41,043 (footnotes omitted); *see also* 17 C.F.R. § 275.206(4)-5(a)(2)(ii).

34.     These coordination and solicitation restrictions, which directly harm Plaintiffs, are purportedly "intended to prevent advisers from circumventing the rule's prohibition on direct contributions to certain elected officials such as by 'bundling' a large number of small employee contributions to influence an election, or making contributions (or payments) indirectly through a State or local political party."  75 Fed. Reg. at 41,043.  The SEC further explained that "[t]his provision is not limited to the bundling of employee contributions.  Another example of conduct that would be prohibited by this section would be an adviser or its covered associates soliciting contributions from professional service providers."  75 Fed. Reg. at 41,043 n.333.

> **c.  *The Political Contribution Rule restricts political contributions through a broad "catch-all" provision.***

35.     The Political Contribution Rule makes it unlawful "for any investment advisor

registered (or required to be registered) with the Commission, or unregistered in reliance on the exemption available under section 203(b)(3) of the Adviser Act (15 U.S.C. 80b-3(b)(3)), or that is an exempt reporting adviser, or any of the investment adviser's covered associates to do anything indirectly which, if done directly, would result in a violation of this section."   17 C.F.R. § 275.206(4)-5(d).

36.     The SEC explains that this provision means that "an adviser and its covered associates could not funnel payments through third parties, including, for example, consultants, attorneys, family members, friends or companies affiliated with the adviser as a means to circumvent that rule."  75 Fed. Reg. at 41,044.

> d.   *The Political Contribution Rule restricts political contributions by imposing extensive recordkeeping requirements.*

37.     The Political Contribution Rule also creates recordkeeping requirements that are not found in FECA, including the requirement that investment advisers "make and keep true, accurate and current" books and records regarding "[a]ll direct or indirect contributions made by the investment adviser or any of its covered associates to an official of a government entity, or direct or indirect payments to a political party of a State or political subdivision thereof, or to a political action committee[.]"  17 C.F.R. §§ 275.204-2(a)(18)(i)(C), 275.204-2(c)(1).

38.     These records must be listed in chronological order identifying each contributor and recipient, the amounts and dates of each contribution or payment, and whether such contribution or payment was subject to the exception for certain returned contributions pursuant to § 275.206(4)-5(b)(2).  17 C.F.R. § 275.204-2(a)(18)(ii).

39.     The burden of these requirements effectively limits the willingness of investment advisers to make political contributions.

### III.     The Political Contribution Rule Harms Plaintiffs and Their Members.

40.     The Political Contribution Rule restricts political contributions made directly or indirectly to certain candidates for elected office.  17 C.F.R. § 275.206(4)-5(a)(2)(i).  The Political Contribution Rule also prohibits coordinating or soliciting payments to a state political party, such as Plaintiffs.  17 C.F.R. § 275.206(4)-5(a)(2)(ii).   These provisions harm Plaintiffs by restricting their ability to fundraise, harm their members by restricting those members' ability to make political contributions, and harm Plaintiffs' members who are or who may become candidates for elected office.

41.     The Political Contribution Rule directly harms Plaintiffs as potential donors have informed each Plaintiff that they will not make political contributions because of the SEC's rule.  At the end of 2012, there were approximately 11,000 registered investment advisors nation-wide— a number which grows exponentially when considering each covered associate of each investment adviser.  Each of these advisors and their covered associates is a potential donor to a state political party who is directly affected by the Political Contribution Rule.

42.     The Political Contribution Rule also harms Plaintiffs' members, whose ability to make contributions is restricted.  Plaintiffs wish to receive contributions from investment advisers and covered associates that, although permitted under FECA, are prohibited by the Political Contribution Rule as either indirect payments to candidates for federal office or are solicited on Plaintiffs' behalf.  Plaintiffs believe that other contributors would contribute to Plaintiffs but for the Political Contribution Rule.  Plaintiffs thus have "standing to sue to vindicate the political-speech rights of its contributors."  *Wis. Right to Life PAC v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011).

43.     Finally, the Political Contribution Rule harms Plaintiffs' members who are current or future candidates for federal elected office whose ability to raise funds is restricted.  Plaintiffs

thus have standing to challenge the Political Contribution Rule on behalf of their harmed members. *See Nuclear Energy Institute, Inc. v. EPA,* 373 F.3d 1251, 1265 (D.C. Cir. 2004); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

44.      Plaintiff New York Republican State Committee is directly harmed by the Political Contribution Rule.  New York State Senator Lee Zeldin won the Republican Party primary election for New York's First Congressional District.  As a member of the New York State Senate, Zeldin is charged with confirming members of the New York Board of Regents, which sets guidelines and standards for managing certain state endowments.  State Senator Zeldin is thus a covered public official of a governmental entity, which restricts his ability to fundraise and Plaintiff New York Republican State Committee's ability to fundraise on behalf of his campaign.

45.      Plaintiff Tennessee Republican Party is directly harmed by the Political Contribution Rule.  The Tennessee Republican Party has state officials currently seeking federal office who are covered by this rule, which restricts Plaintiff Tennessee Republican Party's ability to fundraise.

46.      The harm posed by the Political Contribution Rule is real and immediate, as the SEC recently charged a Philadelphia-area private equity company with violating the Political Contribution Rule when an associate of the company made political contributions to the Governor of Pennsylvania and the Mayor of Philadelphia while the firm was continuing to receive advisory fees from the city and state pension fund.  *See In re TL Ventures, Inc.*, Investment Advisers Act of 1940 Release No. 3859, 2014 WL 2800809 (June 20, 2014) (administrative proceeding).  But for the Political Contribution Rule, the political contributions at issue in *TL Ventures* were within the amounts otherwise permitted by law.

**IV.    FECA Exclusively Governs Campaign Contributions to Candidates for Federal Elected Office and the FEC Alone Administers FECA.**

*a.   FECA exclusively governs campaign contributions.*

47.    FECA comprehensively regulates financial contributions to federal candidates, PACs, and political parties:

48.    FECA, as amended, limits an individual to contributions of $2,600 per election for a candidate for federal office.  *See* 2 U.S.C. § 441a(a)(1)(A).  S*ee also* Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 78 Fed. Reg. 8530, 8532 (Feb. 6, 2013).

49.    FECA, as amended, limits a political action committee to contributions of $5,000 per election to a candidate for federal office.  *See* 2 U.S.C. § 441a(a)(2)(A).

50.    FECA, as amended, limits an individual to contributions up to $10,000 per calendar year to a state party's federal campaign account. 2 U.S.C. § 441a(a)(1)(D).

51.    FECA also imposes substantial recordkeeping and reporting requirements on certain persons and organizations that make political contributions in connection with a federal election.

52.    FECA also includes "pay to play" rules, through which Congress only sought to limit political contributions of federal government contractors.  *See* 2 U.S.C. § 441c(a).

53.    When substantially amended by the Bipartisan Campaign Reform Act of 2002, FECA was not amended to include any further "pay to play" restrictions, even though Congress was aware of the SEC's attempt to do so in 1999.

*b.   The FEC is solely responsible for administering FECA.*

54.    FECA specifies that the FEC "shall administer, seek to obtain compliance with, and formulate policy with respect to, this Act and chapter 95 and chapter 96 of title 26.   The

Commission shall have exclusive jurisdiction with respect to the civil enforcement of such provisions." 2 U.S.C. § 437c(b)(1). *See also Democratic Party v. Nat'l Conserv. Pol. Action Comm.*, 578 F. Supp. 797, 806 (E.D. Pa. 1983) (This provision "[w]as enacted by Congress to make clear that only the FEC, and no other *governmental* authority, would have jurisdiction to enforce" FECA's provisions.)

55.     The FEC Commissioners who signed the November 1, 1999 letter stated that FECA's legislative history "demonstrate[s] that the FECA is a comprehensive statutory scheme intended by Congress to occupy the field of regulative federal elections." And, the Commissioners continued, the FEC is granted "the sole jurisdiction to enforce the provisions contained within the FECA's covered area." As it is "beyond dispute that a state statute imposing restrictions on investment advisors' contributions to state officials could not be applied to state officials' Federal campaign activity," the Commissioners explained, "an effort by the SEC to impose restrictions on the Federal campaign activity of state officials solely due to their state office is at direct variance with the purpose and intent of the FECA's state preemption."

### COUNT I
### (Violation of the Administrative Procedure Act)

56.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

57.     The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. § 2201(a).

58.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

59.    The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." *Id.* § 704.

60.    The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*, "(A) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." *Id.* § 706(2).

61.    The SEC constitutes an "agency" whose final actions are reviewable under the APA.  The Political Contribution Rule is "final agency action" subject to judicial review.

62.    Plaintiffs are harmed by the Political Contribution Rule because it restricts their ability to raise funds and restricts their members from making political contributions that they would otherwise be permitted to make.

63.    The Political Contribution Rule is unlawful and violates the APA because it (i) is beyond the SEC's statutory authority and jurisdiction and is arbitrary and capricious; (ii) regulates activity that Congress has placed within the FEC's exclusive regulatory authority; and (iii) violates the First Amendment.

> a.    *The Political Contribution Rule exceeds the SEC's statutory authority and is arbitrary and capricious.*

64.    The SEC lacks any statutory authority to impose limitations, conditions, or legal consequences on any individual's right or ability to make contributions to candidates for elected office, political action committees, or state political parties or to solicit others to do the same.

65.    Likewise, the SEC lacks any statutory authority to require investment advisers to keep records of its or its covered associates' federal contributions to candidates, political parties, or PACs.

66.     The SEC is statutorily responsible for regulating activities of investment advisers that are fraudulent, deceptive, or manipulative.  15 U.S.C. § 80b-6(4).  The purported target of the SEC Political Contribution Rule—political corruption, or the appearance thereof—is not mentioned anywhere in the Advisers Act.

67.     The conduct the SEC claims to target—actual pay to play activities—is already prohibited by federal and state criminal law.  *See, e.g.*, 18 U.S.C. § 201 (prohibiting payment of bribes to federal officials); N.Y. Penal Law § 200.04 (prohibiting payments of bribes to state officials); Tenn. Code Ann. § 39-16-102 (same).  And pay to play schemes are already covered by existing SEC rules.  *See, e.g.*, Complaint, *SEC v. Morris*, No. 09-2518 (S.D.N.Y. Mar. 19, 2009) (charges brought under Securities Exchange Act of 1934 Section 10(b) and 17(a) as well as Sections 206(1), (2) of the Investment Advisers Act of 1940 for a pay to play scheme involving state retirement fund).

68.     The SEC recognized that the Political Contribution Rule exceeds its delegated authority, acknowledging that it is a "prophylactic" rule "that *may* prohibit acts that are not themselves fraudulent." 75 Fed. Reg. at 41,022 (emphasis added).  "The rule impacts contributions regardless of whether they are being made for the purpose of engaging in pay to play."  *Id.* at 41,058.  The SEC is prohibited from using its authority to, "'by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative'" to enact rules that prohibit conduct beyond that which is fraudulent, deceptive, or manipulative.  *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 12 n.11 (1985).

69.     The other alleged ills the SEC claims are addressed by the Political Contribution Rule—including (i) "the most qualified adviser *may* not be selected or retained," (ii) "[t]he pension

plan *may* pay higher fees because advisers must recoup the contributions, or because contract negotiations may not occur on an arm's-length basis," and (iii) "[t]he absence of arm's-length negotiations *may* enable advisers to obtain greater ancillary benefits"—are vague and similarly beyond the SEC's delegated authority.  *See* 75 Fed. Reg. at 41,022 (emphases added).

70.     In its Final Rule, the SEC asserts:  "We believe that payments to State officials as a quid pro quo for obtaining advisory business as well as other forms of 'pay to play' violate the antifraud provisions of section 206 of the Advisers Act."  75 Fed. Reg. at 41023.  Likewise, the Political Contribution Rule is purportedly aimed at "[i]nvestment advisers that seek to influence government officials' awards of advisory contracts by making or soliciting political contributions to those officials[.]"  75 Fed. Reg. at 41,019.

71.     This attempt to shoehorn the Political Contribution Rule into the SEC's statutory authority is unavailing as it conflates "payments to State officials as a quid pro quo for obtaining advisory business" with campaign contributions.  *Id.* at 41,023.  Decades of Supreme Court precedent rejects treating all campaign contributions as "bribes," and all campaign contributors who work as investment advisers as presumptively seeking favors from corrupt officials.  *See Buckley v. Valeo*, 424 U.S. 1, 21 (1976) ("A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.").

72.     The federal individual contribution limit amount is, in Congress' judgment and as a matter of law, non-corrupting and does not present a *quid pro quo* threat.  *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1452 (2014) ("Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption."); *Davis v. FEC*, 554 U.S. 724, 737 ("[I]f Congress concludes that allowing contributions of a certain amount does not create an undue risk of corruption or the appearance of corruption, a candidate who wishes

to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly"); *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) ("[W]e have 'no scalpel to probe' each possible contribution level. ... In practice, the legislature is better equipped to make such empirical judgments .... Thus ordinarily we have deferred to the legislature's determination of such matters.") (quoting *Buckley,* 424 U.S. at 30)).

73.     In light of Congress's judgment, neither a lawful contribution in an amount greater than $150 or $350 per election, as applicable, and not more than $2,600 per election, from a covered investment advisor to a covered candidate for federal office nor a lawful contribution to a political party committee can be treated by the SEC as an "act, practice, or course of business [that] is fraudulent, deceptive, or manipulative." *See* 15 U.S.C. § 80b-6(4).

74.     The SEC's attempt to define alternative limits through the *de minimis* exception was arbitrary and capricious.  As an institution, the SEC has no specialized knowledge of, or insight into, campaign finance and elections.  The rejection of a larger figure, on the grounds that it "strikes us as a rather large contribution that could influence the hiring decisions," demonstrates the arbitrary nature of the SEC's decision.  75 Fed. Reg. at 41,035.

75.     To the extent the SEC attempted to issue the Political Contribution Rule under its authority to enact rules "reasonably designed to prevent" conduct by investment advisers that is fraudulent, manipulative, or deceptive, 15 U.S.C. § 80b–6(4), it did so arbitrarily and capriciously. The Supreme Court has upheld a prophylactic rule where there was "fair assumption that trading on the basis of material, nonpublic information will often involve a breach of a duty of confidentiality to the bidder or target company ...." *United States v. O'Hagan*, 521 U.S. 642, 676 (1997).  But it is decidedly *not* fair to assume—and the First Amendment does not allow the SEC to assume—that every or most or even many political contributions made by investment advisers

to covered officials will involve the kind of *quid pro quo* arrangement that the SEC has authority

to regulate under the Advisers Act (assuming it has such authority at all).  "Categorical rules" may

be proper when they "reflect broad generalizations holding true in so many cases that inquiry into

whether they apply to the case at hand would be needless and wasteful." *Ragsdale v. Wolverine*

*World Wide, Inc.*, 535 U.S. 81, 92-93 (2002).  But "[w]hen the generalizations fail to hold in the

run of cases … the justification for the categorical rule disappears." *Id.* at 93.  Here, the

"generalization" that political contributions by investment advisers to covered officials involve,

not just *quid pro quo* arrangements, but such arrangements as are within the SEC's authority to

regulate under the Advisers Act, "fail[s] to hold in the run of cases." *Id.*  Thus, the purported

justification for the SEC rule "disappears," making the Political Contribution Rule arbitrary and

capricious.

> **b. *The Political Contribution Rule attempts to regulate activity that Congress has placed under the exclusive province of the FEC.***

76.     The SEC's lack of statutory authority to issue the Political Contribution Rule is

clear from Congress' decision to delegate authority over campaign contributions exclusively to the

FEC through FECA.  This Court held in 1980 that "Congress has legislated in no uncertain terms

with respect to FEC dominion over the election law." *Common Cause v. Schmitt*, 512 F. Supp.

489, 502 (D.D.C. 1980) (three-judge court), *aff'd by an equally divided Court*, 455 U.S. 129

(1982).

77.     Just as FECA preempts state attempts to establish limits and prohibitions regarding

federal political contributions, *see* Federal pre-emption of state law, FEC Advisory Op. 2009-

21(quoting FEC Advisory Op. 1988-21), so too does FECA prevent attempts by other federal

agencies like the SEC to create limits or prohibitions on political contributions to candidates for

federal office.

78.     State attempts to supplement FECA's contribution limits and prohibitions are preempted and invalid because "the central aim of [FECA's Section 453 preemption] clause is to provide a comprehensive, uniform Federal scheme that is the sole source of regulation of campaign financing ... for election to Federal office."  Federal pre-emption of state law, FEC Advisory Op. 2009-21(quoting FEC Advisory Op. 1988-21).

79.     The D.C. Circuit has held that federal agencies may not impose requirements on federal political contributions where those requirements go beyond the requirements of FECA. *See Galliano v. U.S. Postal Serv.*, 836 F.2d 1362 (D.C. Cir. 1988) (holding that the U.S. Postal Service improperly imposed disclaimer and name identification requirements on a federal political committee's mailings) (R.B. Ginsburg, J.).  As the Court explained:

> A fine balance of interests was deliberately struck by Congress in the name and disclaimer requirements of FECA.  Those provisions, we think it fair to infer, represent more than a minimal requirement that the Postal Service is free to supplement.  Rather, we believe they were meant to provide a safe haven to candidates and political organizations with respect to those organizations' names and sponsorship.  If FECA requirements are met, then as we comprehend the legislation, no further constraints on names and disclaimers may be imposed by other governmental authorities.

*Id*. at 1370.  The same principles apply to FECA's contribution limitations and prohibitions.

80.     But for the Political Contribution Rule, an investment adviser or covered associate who is not a federal government contractor or a foreign national may lawfully contribute up to $2,600 per election to a candidate for federal office or $10,000 per calendar year to a state political party committee without losing the ability to seek and be awarded an advisory services contract. *See* 2 U.S.C. § 441a.

81.     Likewise, but for the Political Contribution Rule, a federal political action committee "controlled by the investment adviser," or by any covered associate, may lawfully

contribute up to $5,000 per election to a candidate for federal office without the investment adviser losing the ability to seek and/or be awarded an advisory services contract from any source.   2 U.S.C. § 441a(a)(2)(A).

82.   The Political Contribution Rule's recordkeeping requirements also obligate investment advisers to maintain records that do not have to be maintained under FECA.

83.   Any effort by the SEC to punish a covered investment adviser for making a contribution to a federal candidate in an amount above $350 or $150, as applicable, would directly conflict with the FEC's exclusive jurisdiction with respect to civil enforcement of federal contribution limits and prohibitions.   FECA precludes the SEC from imposing a lower contribution limit on investment advisors based on the SEC's judgment that the otherwise applicable federal contribution limit is too high.

*c.   The SEC's interpretation of its authority violates the Constitution.*

84.   The SEC's interpretation of its statutory authority would create First Amendment violation.   *See infra* Count II.

85.   D.C. Circuit precedent requires this Court to "avoid a constitutional question … where the evidence of congressional intent supports an interpretation that avoids such problems[.]" *Saadeh v. Farouki*, 107 F.3d 52, 58 (D.C. Cir. 1997).

86.   A court reviewing an agency regulation asks first "[w]hether Congress has directly spoken to the precise question at issue."   *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842 (1984).   Here, Congress has spoken directly to the precise question at issue. In FECA, Congress determined that any individual who is not a foreign national or federal government contractor may contribute up to $2,600 per election to a candidate for federal office. The Political Contribution Rule contravenes this "unambiguously expressed intent of Congress."

*Id.* at 843.  Alternatively, the Political Contribution Rule is not "a permissible construction of the statute."  *Id.*

87.     Were Congress' intent about the question at issue ambiguous, a reviewing court may give deference to how the agency answered the question.  *Id.* at 843.  Under D.C. Circuit precedent, however, a court will not give *Chevron* deference to an agency's "interpretation of an ambiguous statutory phrase if that interpretation raises a serious constitutional difficulty."  *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1090 (D.C. Cir. 2012).  In other words, the "canon of constitutional avoidance trumps *Chevron* deference."  *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008).

## COUNT II
### (Violation of the First Amendment to the United States Constitution)

88.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs.

89.     "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association[,]" which includes "an individual contribut[ing] to a candidate[.]"  *McCutcheon*, 134 S. Ct. at 1448.  Indeed, "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders."  *Id.* at 1440–41.

90.     The government may only regulate campaign contributions in order to combat *quid pro quo* corruption.  *McCutcheon*, 134 S. Ct. at 1441.  The Political Contribution Rule fails to combat *quid pro quo* corruption, but is instead based on speculation that pay to play activities might occur within public pensions and that the Rule might restrict such practices.  *See* 75 Fed. Reg. 41,022.  The government may not impose contributions limits based on speculation. *McCutcheon*, 134 S. Ct. at 1456.

91.     The Political Contribution Rule creates different contribution limits based upon the speaker's identity, in violation of the First Amendment. *Citizens United v. FEC*, 558 U.S. 310, 350 (2010) ("The rule that political speech cannot be limited based on a speaker's wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker's identity."). Laws that restrict speech based on the speaker's identity are "[o]ften simply a means to control content." *Id*. at 340.

92.     The Political Contribution Rule also creates different classes of candidates for the same office, in violation of the First Amendment. The Political Contribution Rule only applies to those candidates who are currently public officials of a governmental entity. 17 C.F.R. § 275.206(4)-5(f)(5), (6). Candidates for the same office who are not state government officials are not covered by the Political Contribution Rule, in violation of the First Amendment. *See Davis*, 554 U.S. at 738 ("We have never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other").

93.     The SEC attempts to overcome this hurdle by justifying the Political Contribution Rule as aimed only at "[i]nvestment advisers that seek to influence government officials' awards of advisory contracts by making or soliciting political contributions to those officials…." 75 Fed. Reg. at 41,019. But "the Government may not seek to limit the appearance of mere influence or access." *McCutcheon*, 134 S. Ct. at 1451. *See also Citizens United*, 558 U.S. at 359 (seeking "influence" is not an adequate constitutional justification for campaign finance restrictions).

94.     The Political Contribution Rule creates precisely the sort of "law that imposes different contribution limits for candidates who are competing against each other" that the Supreme Court invalidated. *See Davis*, 554 U.S. at 738.

95.     Furthermore, the government may not impose political contribution limits on top

of the current base limits without showing that the additional restrictions are necessary to prevent

*quid pro quo* corruption.   Just this year the Supreme Court held that "we leave the base limits

undisturbed" because "[t]hose base limits remain the primary means of regulating campaign

contributions[.]"  *McCutcheon*, 134 S. Ct. at 1451.  *See also Davis v. FEC*, 554 U.S. at 737 ("[I]f

Congress concludes that allowing contributions of a certain amount does not create an undue risk

of corruption or the appearance of corruption, a candidate who wishes to restrict an opponent's

fundraising cannot argue that the Constitution demands that contributions be regulated more

strictly"); *Randall v. Sorrell*, 548 U.S. at 248 ("[W]e have 'no scalpel to probe' each possible

contribution level. … In practice, the legislature is better equipped to make such empirical

judgments. … Thus ordinarily we have deferred to the legislature's determination of such

matters.").

96.     And further, the fine line between "*quid pro quo* corruption" and "general

influence" "[m]ust be respected in order to safeguard basic First Amendment Rights."

*McCutcheon*, 134 S. Ct. at 1451.

97.     The Political Contribution Rule forces a covered investment adviser to choose

between exercising a First Amendment right and retaining the ability to engage in professional

activities.  As imposed by the Political Contribution Rule, this is an impermissible choice.  *See*

*Davis*, 554 U.S. at 739 (holding that the Bipartisan Campaign Reform Act "[i]mpose[d] an

unprecedented penalty on any candidate who robustly exercises that First Amendment right" and

"[r]equire[d] a candidate to choose between the First Amendment right to engage in unfettered

political speech and subjection to discriminatory fundraising limitations"); *see also id*. at 740

(explaining that "a candidate who wishes to exercise that right has two choices: abide by a limit

on personal expenditures or endure the burden that is placed on that right by the activation of a

scheme of discriminatory contribution limits").

98.    In addition to the foregoing, the SEC attempts to justify its encroachment on protected speech as necessary to protect "fairness" of public contracts, which is "wholly foreign" to the First Amendment.  *Davis*, 554 U.S. at 741-42; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray for the following relief:

1.    An order and judgment declaring that the SEC's Political Contribution Rule violates the APA as applied to federal campaign contributions;

2.    An order and judgment declaring that the SEC lacked and lacks authority or jurisdiction to issue the Political Contribution Rule as it applies to federal campaign contributions;

3.    An order and judgment declaring that the Political Contribution Rule as applied to federal campaign contributions violates the First Amendment;

4.    An order and judgment enjoining the SEC from enforcing the requirements of the Political Contribution Rule with respect to federal campaign contributions;

5.    Costs and attorneys' fees pursuant to any applicable statute or authority; and

6.    Any other relief that this Court deems just and appropriate.

Respectfully submitted,

_____

Jason Torchinsky (D.C. Bar No. 976033)
J. Michael Bayes (D.C. Bar No. 501845)
Shawn Sheehy
HOLTZMAN VOGEL JOSEFIAK PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Phone: (540) 341-8808
Fax: (540) 341-8809
jtorchinsky@hvjlaw.com
mbayes@hvjlaw.com
ssheehy@hvjlaw.com

H. Christopher Bartolomucci (D.C. Bar No. 453423)
Brian J. Field (D.C. Bar No. 985577)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
Phone: (202) 234-0090
Fax: (202) 234-2806
cbartolomucci@bancroftpllc.com
bfield@bancroftpllc.com

*Counsel for Plaintiffs*
*New York Republican State Committee and*
*Tennessee Republican Party*

Dated:  August 7, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of August, 2014, I sent the foregoing Complaint by

overnight delivery to:

Hon. Anne Small
General Counsel
United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

/s/ H. Christopher Bartolomucci
H. Christopher Bartolomucci