# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW YORK REPUBLICAN STATE COMMITTEE, *et al.*, | Civil Action No. 14-01345 |
| Plaintiffs, | Judge Beryl A. Howell |
| v. | |
| SECURITIES AND EXCHANGE COMMISSION, | |
| Defendant. | |

## MEMORANDUM OPINION

The New York Republican State Committee and the Tennessee Republican Party seek declaratory and injunctive relief invalidating and enjoining the defendant, the Securities and Exchange Commission ("SEC" or "Commission"), from enforcing an SEC regulation, which was adopted over four years ago and codified at 17 C.F.R. § 275.206(4)–5 (the "Challenged Rule"). Compl. ¶ 2, ECF No. 1.[1] The Commission counters that this case "was filed in the wrong court at the wrong time by the wrong plaintiff," Def.'s Opp'n Mot. Prelim. Inj. at 1 ("Def.'s Opp'n"), ECF No. 18, and should be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Def.'s Mot. Dismiss, ECF No. 10. The

---

[1] As explained in Part I.C., *infra*, in addition to the Challenged Rule, the Complaint expressly targets two other SEC regulations for invalidation as part of what the plaintiffs define as the SEC's "Political Contribution Rule": 17 C.F.R. §§ 275.204–2 and 275.206(4) –3 . *See* Compl. ¶ 2 ("Through this action, Plaintiffs challenge the lawfulness of the SEC's 'Political Contribution Rule,' 17 C.F.R. §§ 275.204–2; 275.206(4) –3; and 275.206(4) –5"); *id*. ¶ 63 ("The Political Contribution Rule is unlawful and violates the APA . . . ."); *id*. ¶ 91 ("The Political Contribution Rule creates different contribution limits based upon the speaker's identity, in violation of the First Amendment."); Prayer for Relief ("Plaintiffs respectfully pray for . . . an order and judgment declaring that the SEC's Political Contribution Rule violates the APA . . . [and] violates the First Amendment."). The plaintiffs' Motion for Preliminary Injunction also sought to invalidate the same three rules. *See* Pls.' Mot. Prelim. Inj., ECF No. 7 ("Plaintiffs New York Republican State Committee and Tennessee Republican Party . . . hereby move for a preliminary injunction in this case invalidating and enjoining enforcement of 17 C.F.R. §§ 275.204–2; 275.206(4) – 3; and 275.206(4) –5 . . . ."). Nevertheless, the plaintiffs subsequently limited their challenge to only one SEC regulation, namely 17 C.F.R. § 275.206(4)–5.

Court agrees with the Commission: The plaintiffs have failed to meet their burden in establishing subject matter jurisdiction because this Court is not the proper forum for their challenge.

## I. BACKGROUND

The Investment Advisers Act of 1940, 15 U.S.C. § 80b, *et seq.*, makes it unlawful "for any investment adviser . . . directly or indirectly . . . to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6. Under the Act, the Commission has the authority to promulgate "rules and regulations . . . reasonably designed to prevent such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." *Id.* § 80b-6(4). Invoking this authority in 2010, the SEC adopted the Challenged Rule, which prohibits a registered investment adviser from providing investment advisory services for compensation to a government entity within two years after making a contribution to certain officials of the government entity. *See* 17 C.F.R. § 275.206(4)-5. The rule targets "pay-to-play" activities, whereby investment advisers "seek to influence government officials' awards of advisory contracts by making or soliciting political contributions to those officials . . . ." *See* Political Contributions by Certain Investment Advisers, 75 Fed. Reg. 41018 (July 14, 2010).

### A. Adoption of the Challenged Rule

As of 2010, public pension plans totaled $2.6 trillion in assets and represented roughly one-third of all U.S. pension assets. *See id.* Government officials are responsible for holding and managing these assets and, in many instances, are responsible for selecting private investment advisers to manage a pension plan's portfolio of assets. *Id.* at 41018–19. A spate of investigations and prosecutions over the past decade revealed the reality of abusive pay-to-play activities in the selection and retention of pension plan investment advisers. *Id.* at 41019 nn.18–

25. For example, in New York, an investment management firm seeking to win investment business from the New York State Common Retirement Fund paid "kickbacks" to advisers of the New York State Comptroller in order to secure the business. *See id.* at 41019 n.18, 20 (referencing *SEC v. Morris, et al.*, No. 09-cv-02518 (S.D.N.Y.)).

The Commission concluded, in light of this and other similar scandals, that "the selection of advisers . . . has been influenced by political contributions" to the government officials responsible for selection.[2] 75 Fed. Reg. at 41019. The Commission identified two problems with such influence. First, distorted selection procedures increase the likelihood that less qualified investment advisers are selected (thereby resulting in lower fund performance) and that these advisers charge higher fees (thereby resulting in a higher cost to the public). *Id.* Second, investment advisers who "seek to influence the award of advisory contracts . . . compromise their fiduciary obligations . . . and defraud prospective clients." *Id.* at 41022. In sum, pay-to-play practices "distort the process by which investment advisers are selected," and therefore create "a conflict of interest between the adviser (whose interest is in being selected) and [the] prospective client (whose interest is in obtaining the best possible management service)." *Id.* As a result, pay-to-play practices are "inconsistent with the high standards of ethical conduct required of fiduciaries under the Advisers Act." *Id.*[3]

Accordingly, on July 14, 2010, the SEC adopted the Challenged Rule, which seeks to limit pay-to-play activity by, among other things, prohibiting investment advisers from receiving

---

[2] The Commission attempted to address this problem in 1999, when the SEC first proposed a rule prohibiting investment advisers from receiving compensation for investment advisory services for a two year period after making a contribution to certain elected officials or candidates. *See Political Contributions by Certain Investment Advisers*, 64 Fed. Reg. 43,556 (proposed Aug. 10, 1999). A final rule was not issued, but the effort was revived in 2009.

[3] Just prior to the Challenged Rule's adoption, Chairwoman Mary Schapiro remarked that "Pay to play practices are corrupt and corrupting. They run counter to the fiduciary principles by which funds held in trust should be managed." Mary L. Schapiro, *Speech by SEC Chairman: Opening Statement at the SEC Open Meeting* (June 30, 2010), available at http://www.sec.gov/news/speech/2010/spch063010mls.htm.

compensation for work provided to a government entity when the investment adviser, or certain covered associates, provided a contribution to certain officials of that entity. The rule was "in the nature of [a] conflict of interest limitation[]" so as to regulate the fiduciary obligations of investment advisers. *Id.* at 41023. The Commission determined that a prophylactic rule was necessary in this instance because "pay to play practices are rarely explicit and often hard to prove." *Id.* at 41022. Moreover, the Commission determined that collective action problems surrounding pay-to-play activities lessened the likelihood of a private solution as both political candidates and investment advisers have an incentive to participate in the system. *Id.*

The Commission explicitly modeled the Challenged Rule on Rule G-37, adopted by the Municipal Securities Rulemaking Board in 1994, and approved by the SEC, which imposed a "two-year timeout" for municipal securities dealers who contributed to an official of a municipal securities bond issuer. *See id.* at 41020; *see also* 59 Fed. Reg. 17621 (April 13, 1994). During a "two-year timeout," a municipal securities dealer is barred from engaging in municipal securities business with an issuer if the dealer, or certain related parties, previously contributed to certain officials of such issuer.[4] The Commission believed that Rule G-37 "significantly curbed pay to play practices in the municipal securities market." 75 Fed. Reg. at 41020. Additionally, the Commission borrowed Rule G-37's timeout approach because the D.C. Circuit had previously upheld Rule G-37 against a First Amendment challenge, *see Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995). 75 Fed. Reg. at 41023 ("[T]he *Blount* opinion has served as an important guidepost in helping us shape our rule.").

---

[4] The Challenged Rule differs from Rule G-37, in that an investment adviser is not barred from providing services to a government entity following a contribution to an official of that entity; rather, an investment adviser is barred from receiving compensation for the provision of services but can otherwise still provide services. *See* 17 C.F.R. 275.206(4)-5.

### B. Requirements of the Challenged Rule

The Challenged Rule makes it unlawful "for any investment adviser registered . . . with the Commission . . . to provide investment advisory services for compensation to a government entity within two years after a contribution to an official of the government entity is made by the investment adviser or any covered associate of the investment adviser . . . ." 17 C.F.R. § 275.206(4)-5. Other provisions in the same Challenged Rule seek to prevent circumvention of this primary prohibition. Specifically, in addition to being unable to make the contribution directly, an investment adviser may not: (1) coordinate and solicit contributions to an official of a government entity to which the adviser provides or seeks to provide services or to a state political party where the adviser seeks to provide services, *id.* § 275.206(4)-5(a)(2)(ii); (2) pay third parties to solicit government entities unless those third parties are "regulated person[s]", *see id.* § 275.206(4)-5(a)(2)(i); or (3) do "anything indirectly which, if done directly, would" violate the rule, *id.* § 275.206(4)-5(d). The rule provides several exceptions, including a "de minimis exception," which permits contributions by covered associates to candidates of up to $350 (if the covered associate is eligible to vote for the candidate) or $150 (if the covered associate is ineligible to vote for the candidate). *Id.* § 275.206(4)-5(b)(1). The Commission was urged to adopt higher contribution limits, but declined because "[t]he $1,000 amount suggested by some commenters strikes us as a rather large contribution that could influence the hiring decision[.]" 75 Fed. Reg. at 41035.

Additional regulations, which were also initially targeted for invalidation by the plaintiffs in their Complaint, require investment advisers to "make and keep true, accurate and current . . . books and records" relating to their business, including political contributions by certain employees to a government official, entity, state political party, or political action committee, 17

C.F.R. § 275.204-2(a)(18)(i)(C), and restrict the ability of investment advisers to retain certain solicitors to assist in solicitation activities, *id.* § 275.206(4)-3.

### C. The Plaintiffs' Legal Challenge

The plaintiffs, the New York Republican State Committee and the Tennessee Republican Party, have state and local officeholders running, or considering running, for federal office. *See* Declaration of Jason Weingartner ¶¶ 7–8, Pls.' Mem. Prelim. Inj., Ex. A. ECF No. 7-2 ("Weingartner Decl."); Declaration of Frederick Brent Leatherwood ¶¶ 7–8, Pls.' Mem. Prelim. Inj., Ex. B., ECF No. 7-3 ("Leatherwood Decl."). The New York Republican State Committee asserts that the Challenged Rule harms one if its members, State Senator Lee Zeldin, a candidate for the U.S. House of Representatives. Weingartner Decl. ¶ 7. As part of the plaintiffs' operations, the plaintiffs have encountered "potential donors who have declined to contribute" to certain federal candidates or have otherwise "limited their contributions to certain candidates" because of the Challenged Rule. Weingartner Decl. ¶ 10; Leatherwood Decl. ¶ 10. Likewise, "donors and potential donors" have either limited or refrained from making contributions to the state party because of the Challenged Rule. Weingartner Decl. ¶ 9; Leatherwood Decl. ¶ 9. The Complaint and the plaintiffs' initial declarations fail to identify either the names or occupations of any such donors, and also fail to allege any specific facts evidencing a decline in contributions to either individual candidates or to the state parties over the course of the four years that the Challenged Rule has been in effect.

On August 8, 2014, the plaintiffs filed a Motion for Preliminary Injunction seeking to invalidate the Challenged Rule (and the two additional rules identified in the Complaint at ¶2) and to enjoin their enforcement as applied to federal campaign contributions. *See* Pls.' Mot. Prelim. Inj., ECF No. 7. Specifically, the plaintiffs "challenge the lawfulness of the SEC's

'Political Contribution Rule,' 17 C.F.R. §§ 275.204-2; 275.206(4)-3; and 275.206(4)-5 . . . ."

Compl. ¶ 2. The plaintiffs allege that the Challenged Rule, and the two other rules, "harm

Plaintiffs by restricting their ability to fundraise, harm their members by restricting those

members' ability to make political contributions, and harm Plaintiffs' members who are or who

may become candidates for elected office." Compl. ¶ 40. As noted, although both the

Complaint and the Motion for Preliminary Injunction identified three regulations, 17 C.F.R. §§

275.204-2; 275.206(4)-3; and 275.206(4)-5, as the regulations targeted for invalidation in this

lawsuit, plaintiffs' counsel clarified during the hearing on the plaintiffs' motion for a preliminary

injunction that the plaintiffs only seek to enjoin 17 C.F.R. § 275.206(4)-5 as it relates to state

officials running for federal office. *See* Tr. of Hearing at 6:3–6 (Sept. 12, 2014) (hereinafter "PI

Hearing") ("What we're challenging is the limitation on individuals and their ability to make

contributions to candidates who run for federal office . . . ."); *see also* PI Hearing 7:5–9

(clarifying in response to questioning by the Court regarding 17 C.F.R. § 275.204-2, that "if the

Court invalidates the limitations on the contributions and the SEC still wants to require them to

maintain records of contributions, I don't know that we're challenging that here."); PI Hearing

7:12–18 (responding to Court's question regarding whether the plaintiffs were challenging "the

cash payments for client solicitations at [17 C.F.R.] 275.206(4)-3," plaintiffs' counsel stated

"No."); PI Hearing 10:6–24.

Less than a week later, on August 13, 2014, the Commission filed a motion to dismiss for

lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).[5] *See*

Def.'s Mot. Dismiss, ECF No. 10. Thus, pending before the Court are two motions, which

---

[5] The Commission also sought to stay consideration of the plaintiffs' preliminary injunction motion pending resolution of the jurisdictional question but this request is denied as moot.

together raise threshold issues about whether this Court has subject matter jurisdiction to hear this case and whether the plaintiffs have standing to bring it.

## II.     LEGAL STANDARD

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  Absent subject matter jurisdiction over a case, the court must dismiss it.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006); FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' . . . and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may "'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'"

*Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1107-1108 (D.C. Cir. 2005)(quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)), and "consider[] facts developed in the record beyond the complaint," *id.  See also Herbert*, 974 F.2d at 197 (in disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."); *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).  The burden of establishing any jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff. *See Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010); *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).

## III.  DISCUSSION

The Commission challenges the Court's jurisdiction to hear, and the plaintiffs' standing to bring, the present case.   For the reasons stated below, this Court lacks subject matter jurisdiction to entertain the suit as judicial review of the Challenged Rule lies exclusively in the Court of Appeals.   Thus, the Court need not reach the alternative threshold issue raised by the Commission about whether the plaintiffs have failed to establish standing to bring the present case.[6]  *See Moms Against Mercury v. Food & Drug Admin.*, 483 F.3d 824, 826 (D.C. Cir. 2007)

---

[6] The Commission vigorously contests the plaintiffs' standing to bring this suit and, indeed, the plaintiffs' initial pleadings and declarations offered scant facts in support of their alleged standing.  Since the plaintiffs, as political parties, are not the target of the Challenged Rule, their original standing theory suffered a central difficulty:  The plaintiffs' standing relied entirely upon the independent actions of third parties not before the Court —*i.e.,* investment advisers. "When redress depends on the cooperation of a third party, 'it becomes the burden of the [party asserting standing] *to adduce facts* showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *U.S. Ecology v. Dep't of Interior*, 231 F.3d 20, 24–25 (D.C. Cir. 2000) (emphasis added) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).  Yet the plaintiffs offered no facts evidencing that, absent the Challenged Rule, investment advisers would take the necessary actions to ameliorate the plaintiffs' alleged injuries.  The Court may not assume hypothetical facts to confer standing. As the Supreme Court explained, "[s]tanding . . . is not an ingenious academic exercise in the conceivable . . . [but] requires . . . a factual showing of perceptible harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (internal quotation marks omitted, alterations in original).  In this sense, the plaintiffs' initial affidavits failed.  The plaintiffs did not: identify specific members harmed by the rules, *see Am. Chemistry Council v. Dep't of Transp.,* 468 F.3d

9

("Where both standing and subject matter jurisdiction are at issue, however, a court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999))).

## A. The Court Lacks Subject Matter Jurisdiction

"In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (quoting *Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012)). "Initial review occurs at the appellate level only when a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency

---

810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact."); submit evidence that but for the Challenged Rule the third parties would have taken the steps desired by plaintiffs, *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004) ("Speculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing."); or demonstrate that a ruling by this Court would redress the claimed injuries, *Klamath Water v. Federal Energy Regulatory Commission*, 534 F.3d 735, 739 (D.C. Cir. 2008) ("In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))).

To cure these deficiencies, the plaintiffs first asked this Court to "assume" certain facts necessary for the plaintiffs to establish standing. *See* PI Hearing at 25:6–10. Finally, on September 17, 2014, *after* briefing on this issue was fully ripe, *after* supplementing their affidavits in their reply briefing, and *after* the hearing on the plaintiffs' motion for preliminary injunction, the plaintiffs belatedly sought leave to file a supplemental declaration from Tennessee State Senator Jim Tracy, Pls.' Mot. Leave to File Decl. of Tenn. State Sen. Jim Tracy, ECF No. 26, which the Court granted, Minute Order, September 17, 2014. Although the Court need not and does not decide the issue, the plaintiffs' supplemental filing buttresses the Tennessee Republican Party's standing. Senator Tracy's declaration avers specific facts evidencing an injury-in-fact, caused by the Challenged Rule, and capable of redress by the Court. Specifically, the Challenged Rule subjects Senator Tracy (a member of the Tennessee Republic Party and candidate in the Republican Primary for Tennessee's Fourth Congressional District) to a different contribution limit than his opponent, who was not a covered official under the Challenged Rule and who therefore may receive donations from investment advisers free of the Challenged Rule's restrictions. Additionally, the declaration identifies specific *de minimis* contributions made to Senator Tracy's campaign, in addition to contributions returned to covered associates by Senator Tracy, so as not to trigger the restrictions imposed by the Challenged Rule. The declaration even avers facts evidencing the potential harm to Senator Tracy from the reduced contributions (an electoral defeat by a scant 38 votes out of 77,504 votes cast). *See* Tracy Decl. ¶ 11. The Commission counters that Senator Tracy is not a covered official under the regulation regardless of the subjective views of Senator Tracy and his campaign supporters. Although Senator Tracy's supporters may have limited their contributions for fear of his possible status as a covered official under the Challenged Rule, "[a]llegations of subjective 'chill' are not . . . adequate" to confer standing. *See United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1379 (D.C. Cir. 1984) (Scalia, J.) (alterations in original) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Accordingly, whether the plaintiffs have standing to bring this case remains in doubt even in light of the plaintiffs' supplemental filings.

action." *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007). In this case, the Commission asserts that Section 213 of the Investment Advisers Act, codified at 15 U.S.C. § 80b-13(a), strips this Court of jurisdiction and vests review exclusively in the Court of Appeals. *See* Def.'s Mot. Dismiss at 4 ("This Court lacks subject matter jurisdiction because jurisdiction to review Commission rules promulgated under the Advisers Act is committed exclusively to the court of appeals.").

Section 213 provides that "[a]ny person or party aggrieved *by an order* issued by the Commission under this subchapter may obtain a review *of such order* . . . in the United States Court of Appeals for the District of Columbia," by filing a petition within sixty days of the Commission's order. 15 U.S.C. § 80b-13(a) (emphasis added). Upon filing of the administrative record, "such court shall have jurisdiction, which . . . shall be exclusive, to affirm, modify, or set aside such order, in whole or in part." *Id.* Section 213 does not expressly address the review of "rules" promulgated by the Commission under the Investment Advisers Act. The Commission does not dispute that the Challenged Rule is in fact a "rule" and not an "order." *See* Def.'s Reply in Support of Mot. Dismiss at 2, ECF No. 24 ("[T]he Commission does not dispute that the pay-to-play rule is a rule."). Jurisdiction in the instant case, therefore, hinges on the interpretation of the word "order" in 15 U.S.C. § 80b-13(a) and whether it encompasses rules, such that jurisdiction for this case vests exclusively in the Court of Appeals. The parties have not cited, and indeed the Court has not discovered, any opinion interpreting "order" for purposes of Section 213 of the Investment Advisers Act.

The Commission contends that under *Investment Company Institute v. Board of Governors of the Federal Reserve System*, 551 F.2d 1270, 1278 (D.C. Cir. 1977), "[t]he term 'order' . . . encompasses rules." Def.'s Mem. Mot. Dismiss at 5. In *Investment Company*

*Institute*, the D.C. Circuit interpreted Section 9 of the Bank Holding Act, which also vests jurisdiction of "orders" in the Court of Appeals, and held that "the purposes underlying Section 9 will best be served if 'order' is interpreted to mean *any agency action* capable of review on the basis of the administrative record," including rules and regulations. *Inv. Co. Inst.* at 1278 (emphasis added). *Investment Company Institute* stated that it is the "record for review and not the holding of a quasi-judicial hearing which is . . . the jurisdictional touchstone." 551 F.2d at 1277. In making this determination, *Investment Company Institute* acknowledged that certain non-jurisdictional provisions of the Bank Holding Act specifically referenced "order or regulation," which suggested a "narrower meaning" of the word "order." *Id. Investment Company Institute* also recognized that the APA defined "'order' as 'the whole or a part of a final disposition . . . of an agency in a matter *other than rulemaking* . . . .'" *Id.* at 1278 (emphasis added). Nevertheless, the Court determined that "the word 'order' has several frequently utilized meanings which vary in scope, and . . . that different sections of the same statute might use the word in different ways." *Id.*

In the decades since *Investment Company Institute*, despite the "clear distinction between the terms 'rule' and 'order,'" it is now "pretty much settled" that "a court of appeals [may] exercise statutory jurisdiction in a pre-enforcement review of rules where the statutory language refers only to 'orders.'" *See* Charles A. Wright & Charles H. Koch, Jr., 33 Federal Practice & Proc. Judicial Review § 8299 (1st ed.). Indeed, the D.C. Circuit has exercised direct-review jurisdiction of agency rules promulgated under the Investment Advisers Act and other statutes containing nearly identical direct appellate review authority—without jurisdictional explanation—in numerous cases since *Investment Company Institute*. *See Fin. Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007) (Investment Advisers Act); *Goldstein v. SEC*, 451 F.3d 873

(D.C. Cir. 2006) (Investment Advisers Act); *Chamber of Commerce of the United States v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) (Investment Company Act); *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010) (Securities Act).  In *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006), the D.C. Circuit entertained a challenge to an SEC rule promulgated pursuant to the Investment Advisers Act.  The petitioners' opening brief described the parties' confusion regarding jurisdiction, noting that Section 213 provides only for review of "orders" and not "rules" and that no court had interpreted Section 213 in the context of a pre-enforcement review of a rule promulgated under the Investment Advisers Act. [7]  *See* Petitioner's Opening Brief, *Goldstein v. SEC*, No. 04-1434 (D.C. Cir. June 23, 2005).  Fully aware of the potential jurisdictional pitfalls, the D.C. Circuit still heard the case and never remarked on the issue of subject matter jurisdiction.  Since each court has an affirmative obligation to satisfy itself of jurisdiction, *Goldstein v. SEC* strongly suggests that jurisdiction to review rules promulgated under the Investment Advisers Act vests exclusively in the Court of Appeals.

In sum, *Investment Company Institute* remains binding precedent and mandates that Section 213, 15 U.S.C. §80b-13(a), be construed to require direct appeal to a Court of Appeals. Accordingly, this Court lacks subject matter jurisdiction to hear the plaintiffs' challenge.

**B.** **Issues in Application of *Investment Company Institute***

Although *Investment Company Institute* defined "order" to encompass "rules" for purposes of a direct review statute, the Court recognizes the multiple difficulties, including those pointed out by the plaintiffs, in applying *Investment Company Institute* to the present case. Nevertheless, these difficulties do not overcome the fundamental principle of *stare decisis*.

---

[7] The parties in *Goldstein* filed suit in both the district court and the D.C. Circuit in order to preserve their rights. The district court stayed proceedings pending a ruling by the D.C. Circuit.  *See* Order, Goldstein, et al. v. SEC, No. 04-cv-2216, ECF No. 5.  Following the D.C. Circuit's decision, *see* 451 F.3d 873 (D.C. Cir. 2006), the parties voluntarily dismissed the district court proceeding.  *See* Notice of Voluntary Dismissal, No. 04-cv-2216, ECF No. 7.

*Brooks v. Grundmann*, 748 F.3d 1273, 1279 (D.C. Cir. 2014) ("'The doctrine of *stare decisis*

compels district courts to adhere to a decision of the Court of Appeals of their Circuit until such

time as the Court of Appeals or the Supreme Court of the United States sees fit to overrule the

decision.'" (quoting *Owens-Ill., Inc. v. Aetna Cas. & Sur. Co*., 597 F. Supp. 1515, 1520 (D.D.C.

1984))).   First, under black letter administrative law an "order" is plainly not a "rule."  Indeed,

the distinction between "rules" and "orders" is the "dichotomy upon which the most significant

portions of the APA are based." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988)

(Scalia, J. concurring); *see also Ala. Power Co. v. FERC*, 160 F.3d 7, 11 n.5 (D.C. Cir. 1988)

("The APA establishes a distinction between rulemaking . . . and adjudication . . . .").  Moreover,

as the D.C. Circuit recognized with respect to a different statute, "[t]he obvious difficulty with

the government's position is that [the] provision putting exclusive review jurisdiction in the

Court of Appeals speaks of orders, but Congress in passing the APA drew a distinction between

orders, which typically follow adjudications, and regulations." *Nat'l Min. Ass'n v. Dep't of

Labor*, 292 F.3d 849, 856 (D.C. Cir. 2002).[8]  Notwithstanding the ordinary distinction in

meaning between "orders" and "rules" in construing a review statute, the decision in *Investment

Company Institute* was premised primarily upon a policy determination: "If the administrative

record forms the basis for review, requiring petitioners challenging regulations to go first to the

district court results in unnecessary delay and expense, . . . and undesirable bifurcation of the

reviewing function between the district courts and the courts of appeals."  551 F.2d at 1276

(internal citations omitted).  Yet, the Supreme Court has cautioned that, even in the context of

[8] The D.C. Circuit determined that jurisdiction was not exclusive to the Court of Appeals in *National Mineral Association* based in part upon the distinction between "rules" and "orders."  The Court drew the distinction, however, only because other language within the statute at issue "ma[d]e rather clear that . . . Congress used the term 'order' to refer to an adjudicatory compensation order, not the promulgation of a regulation . . . ." *Nat. Min. Ass'n*., 292 F.3d 856; *see also* 33 U.S.C. § 921 (entitled "Review of Compensation Orders").  Notably, neither the Court nor the parties in that case referenced *Investment Company Institute*.  *See id.*

administrative law, "[w]hether initial subject-matter jurisdiction lies initially in the courts of appeals must of course be governed by the intent of Congress and not by any views we may have about sound policy." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 746 (1985); *see also Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1336 (D.C. Cir. 2013) (same).

Second, by interpreting "order" to include rulemaking, Section 213 provides for a different meaning of the word "order" based upon the statutory section, since applying this same interpretation uniformly would render whole clauses within the statute superfluous. *See*, *e.g.*, 15 U.S.C. § 80b-11 ("The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as are necessary or appropriate to the exercise of the functions and powers conferred upon the Commission elsewhere in this subchapter."); s*ee also Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context."); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232, (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Third, such an interpretation appears to strip jurisdiction from *any court* to hear pre-enforcement constitutional challenges to SEC rules filed after sixty days from the issuance of the rule.[9]  *See* 15 U.S.C. § 80b-13 ("Any person or party aggrieved by an order issued by the Commission under this subchapter may obtain a review of such order in the United States court of appeals . . . , by filing in such court, *within sixty days* after the entry of such order, a written

---

[9] Although, the Section 213 uses the permissive "may" rather than the directive "shall," the D.C. Circuit has made clear that such language provides the Court of Appeals with exclusive jurisdiction. *Telecomm. Research & Action Ctr. v. Fed. Commc'n Comm'n*,  750 F.2d 70, 75 (D.C. Cir. 1984) ("[W]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals."); *see also Wagner v. Fed. Election Comm'n*, 717 F.3d 1007, 1012 (D.C. Cir. 2013) ("Congress sometimes includes the word 'exclusive' to make clear that a particular statute confers exclusive jurisdiction.  But the Congress also deploys 'may' as a verbal auxiliary in many statutes the courts have interpreted to confer exclusive jurisdiction.").

petition . . . .") (emphasis added). This raises grave constitutional concerns. "There may well be limits as to how severely Congress can restrict the route to judicial review of constitutional challenges when it keeps that route partially open." *Am. Coal. For Competitive Trade v. Clinton*, 128 F.3d 761, 765–66 (D.C. Cir. 1997). By the terms of Section 213, after sixty days, no court may exercise pre-enforcement jurisdiction over a constitutional challenge to an SEC rule, which is problematic in situations, like the present, where subsequent Supreme Court jurisprudence calls into question the constitutionality of the challenged rule. The SEC attempts to forestall such concerns by permitting the plaintiffs, and other similarly situated parties, to petition the SEC to amend the rule. Should the SEC reject the proposed amendment, a new sixty day clock would start within which period the party could file for review in the appropriate Court of Appeals. *See* PI Hearing 40:22–41:11; *see also Inv. Co. Inst.*, 551 F.2d at 1281 ("For example, if a regulation does not become ripe for review within 30 days, an aggrieved party can wait until sufficient information as to the regulation's concrete effect is available, petition the Board for reconsideration of the regulation on the basis of the new information, and seek review of the Board's decision in this court."); 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.").

Fourth, the D.C. Circuit has subsequently undermined the basis for the decision in *Investment Company Institute*. While *Investment Company Institute* declined to incorporate the APA definition of order into the direct review statute, the D.C. Circuit has since instructed courts to "look to the Administrative Procedure Act . . . when an agency's direct-review statute [does] not define 'order.'" *Watts*, 482 F.3d 501, 505 (D.C. Cir. 2007) (citing *APCC Servs., Inc. v. Sprint Communic'ns Co.,* 418 F.3d 1238, 1249 (D.C. Cir. 2005)). As noted, under the APA, an "'order' means the whole or a part of a final disposition, whether affirmative, negative,

injunctive, or declaratory in form, of an agency in a matter *other than rule making . . . .*" 5 U.S.C.A. § 551(6) (emphasis added).  The *Watts* framework would seem to require this Court to exercise jurisdiction over the present case, but *Watts* did not cite to or discuss the holding of *Investment Company Institute.*

Where two D.C. Circuit decisions seemingly conflict, the District Court must still attempt to harmonize the decisions.  *See Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005) (discussing need to read cases in "harmony" because the D.C. Circuit "is bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court") (citing *Brewster v. Commissioner*, 607 F.2d 1369, 1373 (D.C. Cir. 1979)).  The *Watts* court addressed the issue whether an "SEC decision not to authorize its employees to give deposition testimony in response to [a] third-party subpoena" constituted an "order" as "used in Section 9 of the Securities Act and Section 25 of the Exchange Act."  482 F.3d at 505-06.  *Watts* held that "a government agency's decision to assert privilege or otherwise not to comply with a subpoena in ongoing civil litigation . . . is simply an ordinary litigation decision, not an agency's 'final disposition'" and was therefore not subject to direct appellate review.  *Id.* at 506.  A decision to the contrary, the *Watts* court reasoned, would "frustrate the traditional role of district courts in resolving discovery disputes" and would create a "bifurcated procedure" for review, permitting review of certain discovery matters in the Court of Appeals while the underlying litigation simultaneously "chugged along in the district court."  *Id.*  Such a result would be "cumbersome, duplicative, and ultimately nonsensical."  *Id.*  The plaintiffs' legal challenge in the instant case concerns not a discovery dispute but a constitutional challenge to a final agency rule.  Direct review in the Court of Appeals would not be "cumbersome, duplicative, and ultimately nonsensical," *see id.*, but would instead permit the parties to "avoid[] an unnecessary layer of

judicial review," *see Inv. Co. Inst.*, 551 F.2d at 322.  Thus, although *Watts* applied a different framework for resolving the definition of "order"—by looking to the APA—the policy justifications regarding efficient judicial review animating the result in *Watts* are consistent with the justifications relied upon in *Investment Company Institute*, and favor direct appellate review in the instant case.

Finally, interpreting "orders" to mean both "orders" and "rules" creates the anomalous result seen in *American Petroleum Institute. v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013).  *American Petroleum Institute* concerned a challenge under Section 25 of the Exchange Act.  Like Section 213 of the Investment Advisers Act, Section 25(a) provided for appellate review of SEC "orders."  Unlike Section 213 of the Investment Advisers Act, however, Section 25(b) specifically provided for agency review of certain, but not all, "rules" promulgated under the Exchange Act.  The D.C. Circuit declined to apply the *Investment Company Institute* framework, reasoning that "applying *Investment Company Institute* to Section 25 would render Section 25(b) superfluous since all Commission rules would be reviewable in this court under Section 25(a)." [10]  *Id.* at 1333.  Thus, in statutes where Congress explicitly provides for appellate review of only certain agency rules, as in Section 25(b) of the Exchange Act, Congress in effect strips the appellate court of jurisdiction to review directly all remaining agency rules even if not enumerated in the statute.  *Id.*  What appears to be an affirmative grant of appellate jurisdiction to review agency rules becomes, in reality, an affirmative revocation of jurisdiction to review all agency rules not otherwise enumerated in the direct review statute.

---

[10] On this point, *American Petroleum Institute's* reasoning is ironic, as *Investment Company Institute* explicitly recognized that its interpretation resulted in superfluous language.  *See Inv. Co. Inst.*, 551 F.2d at 1278 (determining that "the word 'order' has several frequently utilized meanings which vary in scope" and that require "different sections of the same statute [to] use the word in different ways" in order to avoid superfluous language).

Accordingly, the plaintiffs' reliance on *American Petroleum Institute* is inapposite. *American Petroleum Institute* did not overturn or even cabin the default rule announced in *Investment Company Institute*. Rather, *American Petroleum Institute* determined that Congress could override the *Investment Company Institute* presumption by providing for explicit review of certain agency rules, thereby rendering district court review appropriate for all remaining rules. While this creates an anomalous result, the decision does not relieve this Court from binding precedent nor mandate a different result in the present case.

Both parties argue at length regarding the inferences to be drawn from these anomalous results and from the history surrounding *Investment Company Institute* and *American Petroleum Institute*. The plaintiffs argue that Section 25(b) of the Exchange Act demonstrates that Congress knows how to provide for direct appellate review of agency rules and that its failure to provide for direct review in the Investment Advisers Act means that jurisdiction lies in the district court. Pls.' Opp'n Def.'s Mot. Dismiss or Stay, at 11, ECF No. 20. The Commission notes that Section 25(b) was drafted prior to *Investment Company Institute*, which established a new default rule that "orders" includes agency "rules." According to the Commission, Congress has not altered the language of the Investment Advisers Act because it was satisfied that *Investment Company Institute* established direct appellate review of agency rules. Def.'s Reply in Support of Mot. Dismiss, at 7 n.1, ECF No. 24. In the end, both parties rely too heavily on inferences drawn from congressional silence. *See Michigan v. Bay Mills Indian Cmty.*, 134 S.Ct. 2024, 2052 (2014) ("[A]rgument from legislative inaction is unavailing. As a practical matter, it is 'impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of' one of this Court's decisions.'" (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) (internal quotation marks and citation

omitted)); *Kimbrough v. United States*, 552 U.S. 85, 103 (2007) ("[W]e decline to read any implicit directive into . . . congressional silence."); *Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("[C]ongressional silence lacks persuasive significance" (internal quotation marks omitted)); *Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law."); *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.").

***

The Court is cognizant that the holding of *Investment Company Institute* produces curious results but that case remains binding precedent in this Circuit and on this Court.[11]  This case must therefore be dismissed for want of subject matter jurisdiction.[12]

## IV.    CONCLUSION

The Court holds that Section 213 of the Investment Advisers Act strips this Court of jurisdiction to hear the pending challenge to the SEC's rule, 17 C.F.R. § 275.206(4)–5, regulating pay-to-play activity by investment advisers.  Accordingly, the Commission's motion to dismiss for lack of subject matter jurisdiction is granted.[13]  The plaintiffs' motion for a preliminary injunction is denied as moot.

---

[11] The plaintiffs make one last argument in passing, claiming that even if *Investment Company Institute* remains binding on the Court, the administrative record in this case is not sufficient to permit judicial review, at least as to the plaintiffs' First Amendment claim.  *See* Pls.' Opp'n Mot. Dismiss at 12.  Yet, during the hearing on the plaintiffs' motion for preliminary injunction, counsel conceded that discovery was likely unnecessary.  *See* PI Hearing at 16:11–17:2 (clarifying in response to questioning by the Court that "I don't think [discovery is] necessary to resolve the case, but if the Court finds it's necessary or the plaintiffs or the defendants seek it, you know, there is some limited discovery that could be helpful to the Court.").  Moreover, in *Blount v. SEC,* the D.C. Circuit considered a first amendment challenge to a nearly identical rule based solely on the administrative record.  61 F.3d 938 (D.C. Cir. 1995).

[12] While the Court might ordinarily transfer the case to the Court of Appeals, both parties in this case agree that the case should be dismissed rather than transferred.  *See* Pls.' Opp'n at 18 n.4; Def.'s Mem. Mot. Dismiss at 7–8.

[13] As noted, *supra* note 5, the Commission also requested a stay of the plaintiffs' preliminary injunction motion pending resolution of the jurisdictional questions, which request is denied as moot.

The case is dismissed.

An appropriate Order accompanies this opinion.

Date: September 30, 2014

_____
BERYL A. HOWELL
United States District Judge